## MARGIE YUVONNE BEAMAN v. STATE.

221 N. W. 2d 698.

September 13, 1974—No. 44099.

*C. Paul Jones,* State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Jonathan H. Morgan,* Solicitor General, *Peter W. Sipkins,* Assistant Solicitor General, and *Robert C. Carlson,* Special Assistant Attorney General, for respondent.

PER CURIAM.

Petitioner, whose conviction for first-degree manslaughter was based upon a plea of guilty, contends on this appeal from the order denying postconviction relief that she should be permitted to withdraw her plea because the record does not contain an adequate factual basis for the plea and because statements she made at the time of entry of plea were inconsistent with the plea.[1] After careful study and consideration, we reverse the order denying postconviction relief.

On December 11, 1970, a Wabasha County grand jury indicted petitioner for first-degree murder in the handgun killing of Harry Francis, a Lake City nurseryman, on November 29, 1970. Petitioner pleaded not guilty to this indictment. The Rasmussen hearing was held on May 10, 1971, and jury selection occurred on May 18, 19, 20, 24, and 25, 1971. During this entire period

---

[1] Petitioner is now free on parole.

petitioner maintained that the killing was accidental and it was clear that the only guilty plea she would consider was to a charge of second-degree manslaughter (negligent, unintentional homicide). However, following the noon recess and just prior to the commencement of trial on May 25, 1971, petitioner's counsel, who was in chambers, received a message from petitioner, who was in the courtroom which was then filling with spectators. After talking with petitioner, counsel advised the court that petitioner, against his advice, wished to plead guilty to first-degree manslaughter. Thereafter, in open court, the state moved to reduce the charge and petitioner entered her plea. At that time petitioner, in response to questions by the court, testified as follows concerning the killing itself:

"Q. Did you point the pistol at Harry Francis?
"A. I brought my hand up, sir, and it went off.
"Q. But it was pointed at Mr. Francis?
"A. It must have been, sir, because it hit him.
"Q. And it was loaded?
"A. Yes, sir.
"Q. And you knew it was loaded?
"A. Yes, sir, I loaded it the day before.
"Q. Did it eventually cause the death of Mr. Francis?
"A. Yes, sir, it did."

After accepting the plea and receiving a presentence report, the trial court, on June 17, 1971, sentenced petitioner to a period of confinement not to exceed 10 years.

Petitioner, who did not appeal from the judgment of conviction, filed her petition for postconviction relief on April 10, 1972. The hearing on this petition was held on July 7, 1972. At this hearing petitioner for the first time testified in detail concerning the killing, saying that she had been involved in a relationship with the victim for a number of years; that she had bought the gun for him as a Christmas gift; that she had seen the victim on Saturday and had told him that she was going to go out of

town for awhile and did not want to take the gun along; that they had agreed to meet the next day at 3 p. m.; that they met and arranged another meeting for later in the afternoon; and that it was at this later meeting that the shots were fired. Petitioner testified that she arrived at the nursery before the victim; that when she arrived she set the gun on some boxes; that while waiting for the victim she thought she saw her husband drive up; that she grabbed the gun and prepared to go out the back door if her husband entered the building, but that her husband did not come in. She then testified that after waiting nervously for approximately 15 minutes she heard the boiler door slam (a signal the victim usually gave when he entered the building), and she advanced to meet and kiss him. Following is her testimony of what then happened:

"Q.  Now at this time when you and Harry came towards each other to put your arms around one another did you point the gun at Harry?

"A.  No, sir; as I was bringing my hand up to throw it around his neck I felt his hand touch my shoulder and I heard the gun go off, and let out a scream, Oh my God, and his hand went for his side and he ran, and then as I ran after him the gun kept going off in all directions."

Petitioner testified as follows as to why she had pleaded guilty:

"Q.  Do you recall that just prior to the first witnesses being called that through your lawyer, one of your lawyers, Paul Brewer, you informed myself and Mr. Tschida that you wished to enter a plea of guilty?

"A.  Yes, sir, because the courtroom was packed and I couldn't bring out Harry's life history to all the people because there were a lot of people from Lake City, and I knew Harry wouldn't want that, and I didn't either; and then after it was over some reporter put it in the paper."

(The newspaper article to which petitioner referred is a part

of the file. It was published shortly after petitioner entered the plea and generally summarizes the story which petitioner later gave at the postconviction hearing. The article was apparently called to the trial court's attention before the court imposed sentence and the court recommended that it be placed in the file.)

After painstaking examination of the record and careful consideration of the briefs, we have concluded that the interests of justice require that we reverse the order denying postconviction relief. Two main factors prompt this conclusion.

First, we believe that there is merit to petitioner's contention that statements she made at the time of plea were inconsistent with the plea and that there was an inadequate factual basis for the plea.

As we have indicated in numerous cases, the purpose of the factual-basis requirement is to ensure the accuracy of the plea, that is, to ensure that the defendant is guilty of a crime at least as serious as that to which he is entering his plea. As stated in the comments to § 1.6 of A. B. A. Standards for Criminal Justice, Standards Relating to Pleas of Guilty:

"It is undoubtedly true that the great majority of defendants who enter a plea of guilty are guilty either of the offense charged or of a more serious offense. However, the risk that a plea which is obtained without resort to threats or other improper inducements and which is entered with full understanding of the possible consequences might nonetheless be inaccurate remains a matter of concern. The defendant may not completely understand what mental state and acts constitute commission of the offense charged, and it may be that his conduct is not as serious as that charged or that he has a valid defense to the charge. A guilty plea may be entered by a psychiatrically disturbed person; unlike a trial of a criminal case, the brief guilty plea process affords the judge little opportunity to detect incompetency unless the defendant is obviously retarded or grossly psychotic. A clearly rational defendant may enter a false plea in the hope of achieving some

goal, as where an innocent defendant is seeking to protect another person. These and similar situations, although rare, have been observed from time to time."

In this case it is true that, as the state points out, there was evidence on the record at the time of entry of plea which was the type of evidence which a jury certainly could consider in determining guilt, and in the right context it could be very damning. However, much of this evidence, at least in the context of this record, is also entirely consistent with the theory that the killing was accidental. This leaves us with petitioner's statement, quoted above, relating directly to what happened. Petitioner's statement also does not necessarily point toward guilt. In substance, what petitioner said was not that she deliberately pointed the gun at the victim and fired it, but that the gun went off and that it must have been pointed at him because the shot killed him. We believe that under the circumstances—particularly where petitioner was pleading guilty to a charge of first-degree manslaughter against the recommendation of her counsel—the trial court should have interrogated petitioner in greater detail and determined precisely what happened when she shot the victim. Of course, the counterargument to this is that a person would not plead guilty to first-degree manslaughter if the killing had, in truth, been accidental. But this ignores the fact that one of the notions behind the factual-basis requirement is that people have been known to plead guilty even though they are innocent.

The second factor influencing our decision is that there is some indication in the record that there may be merit to defendant's claim that the killing was accidental. An examination of the presentence investigation report reveals the following:

(a) The victim lived approximately $3\frac{1}{2}$ hours after the shooting, during which time he stated that an unknown intruder had shot him. It would seem that if the victim had thought the shooting was intentional, he would have identified petitioner as the person who shot him.

(b)   The sheriff, who with his wife had custody of petitioner in the period preceding the change of plea, stated that the number of shots fired and the directions in which they were fired suggest to him that the gun was fired without control or thought and due to a nervous reaction rather than an intentional plan.

In citing this, we do not mean to imply that we believe that there is no evidence which would justify a conviction or that we have any opinion whatever as to defendant's guilt or innocence. We do believe, however, that the presentence investigation report should have alerted the trial court that possibly it had erred in accepting petitioner's guilty plea without inquiring more thoroughly into the shooting itself and the events surrounding it.

In conclusion, we believe that the factual basis for the plea was inadequate and that the interests of justice require that petitioner be permitted to withdraw her guilty plea.

Reversed and remanded.